UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-28 (RHK)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) GOVERNMENT'S POSITION ) WITH RESPECT TO SENTENCING ) |
| PAPA FAAL, | ) ) ) |
| Defendant. | ) |

The United States of America, by and through its attorneys Andrew M. Luger, United States Attorney for the District of Minnesota, Assistant United States Attorney Charles J. Kovats, Jr., and Department of Justice Trial Attorney Richard S. Scott hereby submits its position with respect to sentencing of Defendant Papa Faal ("Faal" or "defendant").

## I.   BACKGROUND ON THE GAMBIA

At Common Appendix I, the government presents a factual background on The Gambia that is relevant to the sentencing proceedings against Faal as well as the following defendants:

> *United States v. Cherno Njie*, 15-CR-35 (RHK/HB)
> *United States v. Alagie Barrow*, 15-CR-35 (RHK/HB)
> *United States v. Banka Manneh*, 15-CR-35 (RHK/HB)

## II.   BACKGROUND ON THE OFFENSE CONDUCT

At Common Appendix II, the government submits an overview of the description of the offenses, defendants, and facts and circumstances describing the conduct at issue. Like Common Appendix I, Common Appendix II is an identical document submitted in

1

each case described above. The specific conduct of the defendant is set forth in more detail in Section III.B below.

### III. THE CASE AGAINST THE DEFENDANT, PAPA FAAL

#### A. The Charges of Conviction

On January 29, 2015, defendant Faal pleaded guilty to Counts One and Two of a two-count Information. Count One charges the defendant with conspiring to participate in an expedition against a friendly nation, in violation of the Neutrality Act (18 U.S.C. § 960), all in violation of Title 18 U.S.C. § 371. Count Two charges the defendant with conspiracy to export firearms from the United States, in violation of the Arms Export Control Act (22 U.S.C. § 2778(b)(2) and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1), all in violation of Title 18 U.S.C. § 371. Taken together, these offenses carry a statutory maximum sentence of 10 years' imprisonment, a maximum term of supervised release of three years, a $500,000 fine, and a $200 mandatory special assessment.

#### B. The Defendant's Offense Conduct

In the plea agreement, defendant Faal admitted the following facts:

Beginning in or about August 2014, the defendant, a resident of Minnesota, joined a group of men who intended to change the leadership in the The Gambia. After joining this group, the defendant learned the group (1) intended to effect this change in leadership through a coup d'etat and (2) had drafted an operations plan designed to accomplish this goal. The leader of the group was known to the defendant by his code

name, "Dave."[1]  Dave was a businessman who financed the operation and would be installed as the leader of The Gambia after the successful coup.

Planning

As a member of the conspiracy, the defendant was provided access to the operations plan through a shared website.  The defendant participated in regular conference calls from his home in Minnesota with the other members of the conspiracy in which both the operation and the logistics required to support the operation were discussed.

Resourcing

In support of the operation, the defendant purchased eight (8) M4 semi-automatic firearms with money provided to him by one of his co-conspirators from firearms vendors in Minnesota.  The defendant hid the weapons in four large barrels - two rifles per barrel.  The defendant stuffed clothing in the barrels around the disassembled weapons to conceal them.  The barrels were "containerized" and shipped under an alias fabricated by the defendant.  In total, the defendant believes these eight (8) firearms were among thirty (30) weapons that were shipped to The Gambia by the members of the conspiracy.  At the time the defendant shipped these eight (8) firearms, concealed in barrels, from the United States to The Gambia, defendant knew it was unlawful to do so.

Execution

On December 4, 2014, approximately four months after joining the conspiracy, the defendant entered The Gambia from neighboring Senegal.  Once in The Gambia, the

---

[1] "Dave" was later confirmed to be co-conspirator Cherno Njie.

3

defendant connected with the other members of the conspiracy who would ultimately participate in the coup. Although the defendant had spoken with many of these individuals during the planning stages of the operation, he had not met any of them before arriving in The Gambia. All the co-conspirators known to him were of Gambian descent; most lived in the diaspora in the United States and Germany.

Once the conspirators were all in The Gambia, they began to implement their Operations Plan. The group initially planned to ambush the President of The Gambia during his over-land travels around the end of December. The group hoped to be in control of the country by New Year's Day. Their plan entailed blocking the President's convoy and ambushing his vehicle. They planned to fire shots into the air to cause his bodyguards to flee. They hoped the President would surrender, but were willing to shoot him if he fired at them.

The group's plans changed when they found out President Jammeh was going to leave the country on December 26, 2014. They hoped to still ambush him, but ultimately abandoned their plans to do so. Instead, the group decided to change their operation again and attack the State House.

On the night of the assault, the conspirators were split in two teams, a five-member "Alpha" Team and a three-member "Bravo" Team. Both Teams met in the woods about a half-mile from the State House. There, they changed into their assault gear and put their other belongings into the rented cars they were using for the assault.

Alpha Team was responsible for attempting to breach the front door of the State House using one of the group's rented vehicles. They were then supposed to disarm the

guards and take control of the building. Bravo Team, including the defendant, was tasked with securing the rear of the building. The group believed the Gambian Army soldiers at the State House would drop their weapons and flee, being unwilling to die for President Jammeh. The group expected that while the two teams took control of the State House, a battalion of Gambian soldiers sympathetic to the conspirators would arrive and offer support.

When the group arrived at the State House, they found that it had been fortified with additional soldiers. According to their plan, Alpha Team fired a shot into the air, hoping the soldiers would give up. Instead, the group began taking heavy fire from the guard towers. Alpha Team attempted to breach the door of the State House. The defendant believes all of the Alpha Team members were killed.

Bravo Team lost radio communications with Alpha Team and decided to retreat. "Sarr," a member of Bravo Team, attempted to drive a car into the State House door. The defendant fled the scene and took refuge in a nearby building, removed his body armor, boots, and military-style clothing, and changed into clothes obtained from a man in the building. The defendant ultimately made his way to the U.S. Embassy in Senegal where he turned himself in.

### C. Other Relevant Conduct

As described above, the defendant purchased and smuggled from the United States eight firearms to be used in the attempt to overthrow the government of The Gambia. When the FBI later had an opportunity to inspect the dozens of firearms recovered by authorities in The Gambia, this inspection demonstrated that a small number of weapons

had obliterated serial numbers - all of which appear to have been purchased by defendant Faal.

### III. SENTENCING GUIDELINES

#### A. The Sentencing Guideline Calculations Agreed to by the Parties

The parties agreed to the following Guideline calculations in the plea agreement:

**Count 1**
Base Offense Level, U.S.S.G. § 2A1.4(a)(2)(B):                               22

Multiple count instruction, U.S.S.G. § 2A1.4(b)(1):                          +3[2]

**Count 2**
Base Offense Level, U.S.S.G. § 2M5.2(a)(1):                                  26

Acceptance of responsibility, U.S.S.G. § 3E1.1(a), (b):                      -3

The defendant believes the Court should apply U.S.S.G. § 2X1.1 and should consider the guideline for Count One to be no greater than 36 months' imprisonment, the statutory maximum for the substantive offense underlying Count One. Also, although the parties agree that Count One and Count Two group together under U.S.S.G. § 3D1.2, the government then believed the resulting offense level would be 27 (*see* U.S.S.G. § 3D1.4(a)), while the defendant argues that grouping results in an offense level of 26.

Now that the number of individuals known to be killed has been revised downward to three, in the government's view, the offense level for Count One should be

---

[2] In the agreement, the parties agreed to a +5 adjustment under the misapprehension that 5 co-conspirators were killed in the assault on the State House. As the investigation continued, the government learned that two individuals whom defendant Faal believed had been killed, had, in fact, survived.

6

25. With this revision, the government now concurs with the defendant's position in the plea agreement: that grouping results in an offense level of 26.

A three-level reduction for acceptance of responsibility should yield a total offense level of 23. Coupled with the parties' understanding that defendant Faal has a criminal history category of I, the resulting range of imprisonment is 46 – 57 months'.

### B. The PSR's Calculations and Recommendations

On or about March 27, 2015, the United States Probation Office ("USPO") disclosed the preliminary PSR ("PSR") in this case. The PSR calculates defendant's applicable guideline range at 46-57 months' imprisonment, based on a total offense level of 23 and a criminal history category of I. (PSR ¶ 93).

The PSR guideline calculations are as follows:

| | | |
|---|---|---|
| Base Offense Level (Count 1): | 0 | (PSR ¶ 40) |
| Base Offense Level (Count 2), U.S.S.G. § 2M5.2(a)(2): | 26 | (PSR ¶ 42) |
| Acceptance of Responsibility, § 3E1.1(a), (b): | -3 | (PSR ¶¶ 50-51) |
| Total Offense Level: | 23 | (PSR ¶ 52) |
| Criminal History Category: | I | (PSR ¶ 58) |
| Guideline Range: | 46-57 months | (PSR ¶ 93) |
| Supervised Release: | 1-3 years | (PSR ¶ 98) |
| Fine: | $10,000-$100,000 | (PSR ¶ 104) |

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

C.  **The Government's Response to the PSR**

The government has no objections to the PSR, except as to the Offense Level Computation contained therein. First, and as described more fully below, the government believes U.S.S.G. § 2A1.4 should be applied by the Court when determining the appropriate guidelines offense level for violation of Count One (18 U.S.C. §§ 371 and 960). The government recognizes that the Sentencing Commission has not provided a specific guideline for this offense and understands the USPO's conclusion that no base offense level should be applied. Nevertheless, the government believes that an adjusted offense level of 25 is warranted here and appropriately describes the reckless conduct of these defendants during the attempted coup.[3] Further, in the government's view, the application of a Base Offense Level of 0, as proposed by the PSR, offers little instruction to the Court in crafting an appropriate sentence.

Second, after applying the base offense level for Count One described above, the government believes that grouping the two offenses in Counts One and Two results in an offense level of 26.

## VI.   THE SENTENCING FACTORS DESCRIBED IN 18 U.S.C. § 3553(a)

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to

---

[3] There is evidence the co-conspirators' original plans targeted the Gambian president personally; however, the execution of the coup did not occur until he had left the State House, and indeed the country. The decision of the conspirators to delay their attack until the president had departed suggests the conspirators had abandoned their plans to target him.

8

determine a sentence sufficient, but no greater than necessary, to achieve the goals of 18 U.S.C. § 3553. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the Court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

A.   **Relevant History and Characteristics of the Defendant**

Defendant Faal's honorable service in both the United States Air Force and the United States Army should be considered by the Court when determining an appropriate sentence for him. The defendant enlisted and served in the Air Force from 2002 through 2009 and, shortly after his discharge, joined the Army as a commissioned officer. (PSR ¶ 81). He served in the Army until 2012. (Id.).

The defendant's Army service is especially notable as it includes a deployment to Afghanistan in support of Operation Enduring Freedom. It was during this deployment that defendant Faal, and his unit, came under enemy fire on a regular basis. As a result of these attacks, other American Soldiers were reportedly killed. (PSR ¶ 70). Although not physically injured, defendant Faal continues to suffer from his memories of these attacks.

It also should be said that defendant Faal did not participate meaningfully in the conspiracy until it was well underway. Indeed, the planning that guided the attempted coup was largely well-formed and not influenced to any great degree by defendant Faal. Further, defendant Faal never traveled to Austin, Texas, to join and conspire with defendant Njie and others in-person. In fact, defendant Faal did not meet the members of the conspiracy until he arrived in West Africa in December 2014, ahead of the coup. He knew the members of the conspiracy only by code names, i.e. "Dave" (Defendant Njie).

**B.     This Prosecution Is Neither an Indictment Nor Defense of The Gambia**

The crimes of the defendant did not occur in a vacuum, but rather were motivated by a fervent desire to overthrow a regime he believed to be inhumane and oppressive. Indeed, all the defendants have justified their crimes by asking others to consider the purported nobility of their goal: regime change in The Gambia. The Court will surely hear these defendants and their supporters vociferously decry the human rights record of the government of The Gambia. They will provide persuasive evidence in this regard. Indeed, the United States government has long been critical of the human rights record of The Gambia. The U.S. Department of State's 2015 Country Report on Human Rights Practices in The Gambia outlines a practice of "torture, arbitrary arrest, prolonged pretrial

and incommunicado detention; enforced disappearance of citizens; and government harassment and abuse of its critics." The Report also noted that Gambian officials "routinely used various methods of intimidation to retain power." In February 2014, the U.S. Department of State condemned anti-LGBT statements by President Jammeh, calling on the Government of The Gambia "to protect the human rights of all Gambians, and we encourage the international community to send a clear signal that statements of this nature have no place in the public dialogue and are unacceptable."

However, the prosecution and sentencing of this defendant is not a defense of the regime in The Gambia, or its practices. The prosecution of this defendant is not an indictment of his previous lawful, peaceful means to advocate for regime change in The Gambia. The defendant enjoys broad freedoms in the United States to advocate, assemble, and vote for matters about which he cares deeply. However, the defendant does not have the freedom to join a private army, acquire an arsenal and smuggle it from the United States to The Gambia, and knowing these resources will be directed toward a (likely bloody) overthrow of a foreign government.

### C. The Defendant's Actions Imperiled Relations Between Nations

According to the United States Department of State, the coup attempt "interfered with U.S. foreign policy toward The Gambia and endangered U.S. interests." (*See* Attachment 1, Declaration of Principal Deputy Assistant Secretary David Wharton (the "Wharton Declaration")). Establishing and maintaining relationships between the United States and other nation states – whether allies or rivals – are the province of the United States government, not of private citizens. When the nature of the relationship involves

the application of violence against another nation state, as is the case here, the risks and the stakes – and therefore the government's interests – are higher still.

Here, the defendant is a United States citizen who was a member of a conspiracy that included the recruitment of "soldiers" from across the United States, Germany, and elsewhere, to join in an attempt to make foreign policy privately. He was also part of a conspiracy that involved the purchase of weapons from across the United States: Minnesota, Texas, Tennessee, Kentucky, and Georgia. Faal purchased firearms himself and unlawfully smuggled these firearms from the United States to The Gambia so that these "soldiers" could take up arms against The Gambia. (*See* Attachment 2, Photographs of Firearms Taken by FBI in Banjul, The Gambia). In so doing, he interfered with the United States government's foreign policy prerogative by launching a private violent attack on a foreign government.

The United States cannot allow her citizens to travel the globe perpetrating acts of violence against foreign governments. Generally, we in the United States would rightly expect that a foreign citizen who conspired to launch a violent assault in our country in order to overthrow our government would receive a lengthy sentence. Moreover, we would also attempt to hold accountable the nation state that provided the venue from which an assault was launched. The same expectation should apply here; our citizens should be held accountable for the destruction and terror they caused in Banjul on December 30, 2014.

Further, it should be of no consequence whether a country attacked by a private army from our shores is a close ally or not. Unauthorized attacks by United States

citizens against foreign governments, no matter how well-intentioned, subject the United States to broad political consequences, including the very real possibility of retaliation both against U.S. citizens in The Gambia and on U.S. soil. In fact, the risk of retaliation against the United States is higher when the attack is launched against a rival country. It is for these reasons that the coup was denounced from the outset by the United States Department of State, "We strongly condemn any attempt to seize power through extra-constitutional means." (*See* Exhibit 1 to Attachment 1, the Wharton Declaration).

### D.  The Defendant's Actions Imperiled Others

The assault on the State House by the defendant and his co-conspirators armed with assault rifles was both doomed to fail, but also reckless in the extreme. The resulting deaths of three of the defendant's co-conspirators represent a tragedy that cannot be unwound. Wives lost husbands and children lost fathers on a dusty street in Banjul, The Gambia, far away from home.

However, providence prevented further loss of life. Shots were fired rather indiscriminately at and by those attacking the State House; fortuitously, no innocent bystanders lost their lives in the crossfire. The photographs taken of a vehicle used by the attackers provide some evidence of the volume of gunfire that was let loose on the night of December 30. (*See* Attachment 3, Vehicle Photographs Taken by FBI Agents in Banjul, The Gambia on May 5, 2015). The United States also feared for the safety of U.S. citizens following the attempted coup. Emergency messages were issued by the United States Embassies in The Gambia and Senegal to warn U.S. citizens to avoid Banjul. (*See* Exhibits 3 and 4 to Attachment 1, the Wharton Declaration). Unlike the

unfortunate three who were killed, the innocent bystanders and U.S. citizens uninvolved in the plot did not assume the same dangerous risks these co-conspirators did when they attacked the State House. But they were subjected to similar risk of death nonetheless.

Finally, immediately after the failed coup on December 30, 2014, the government of The Gambia began rounding up dozens of individuals it suspected to be involved in the plot. According to the United Nations Special Rapporteur on Torture, "at least 52 people have been detained, most by men in civilian clothing thought to work for the state intelligence agency. Several were released between February and May [2015], and it is unclear how many remain in incommunicado detention." (*See* Attachment 4, Amnesty International Article published May 27, 2015). To be clear, to the extent any of these individuals suffered abuse at the hands of authorities of The Gambia, the responsibility for that abuse lies solely with those same authorities; however, it also must be said that the defendants set in motion a series of events that made these abuses eminently foreseeable.

### E. Subjective Motives Do Not Make Good Foreign Policy

The defendant suggests that his motives for seeking regime change were noble and that his (intended) ends, ending oppression, justified his means, the application of unlawful violence. In the government's view, the defendant's subjective motives – however pure or honorable they be in his mind – do not justify his criminal activities. Every would-be revolutionary believes in the righteousness of his or her cause. Further, the consequences of such "noble" action can be dangerous and far-reaching. One can only imagine the consequences if a group of "well-intentioned" U.S. citizens attempted to

14

overthrow a powerful rival to the United States. Finally, *even if* the United States generally agreed with the defendant's criticisms of the Gambian regime and his subjective motives for his crimes, the positions espoused by future coup plotters may not be at all in line with the policies and/or values of the United States, and the government cannot, and should not, endorse any efforts to effect one's subjective beliefs, whatever they may be, by the violent overthrow of a foreign government.

### F. The Court's Sentence Should Promote Both Individual and General Deterrence

Given the nature of the offenses and the defendant's motive to commit the offense, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again. Here, the Court should consider the defendant's willingness to sacrifice years of his time, his expenditure of significant effort in planning the coup and the follow-on government, his willing investment of a small fortune to resource the coup, and his willingness to put his and others' lives at risk, when fashioning a sentence that might deter this defendant from re-engaging in a further scheme against The Gambia. Indeed, the fact that the defendant was willing to lose his life in this effort suggests individual deterrence will not come inexpensively. The Court's sentence should be sufficiently severe so as to deter this defendant from re-engaging in a second scheme. In the government's view, this should include both a 51-month custodial sentence as well as a significant financial penalty.

General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an

appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)). The State and District of Minnesota has a recent and troubled history of young men leaving the United States to engage in violence overseas. While the motives of this defendant and his co-conspirators are very different from those traveling from Minnesota to Somalia and Syria to engage in violence, the Court should craft a sentence in this case that will attempt to dissuade any United States citizen from traveling abroad to commit acts of violence to further their own deeply held political or ideological beliefs.

Dated: April 29, 2016

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

_____
CHARLES J. KOVATS, JR.
Assistant United States Attorney

_____
RICHARD S. SCOTT
Trial Attorney
U.S. Department of Justice